1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   BILL G. DESTEFANI,                      Case No. 2:20-cv-10126-FLA (AFMx)

12                          Plaintiff,
                                             **ORDER GRANTING IN PART AND
13            v.                             DENYING IN PART DEFENDANTS'
                                             MOTION TO DISMISS [DKT. 20]**
14

15   UBISOFT ENTERTAINMENT, et al.,

16                          Defendants.

17

18

19

20                                   **RULING**

21        Before the court is Defendants Ubisoft Entertainment, Ubisoft, Inc., and Ivory

22   Tower's (collectively, "Defendants") Motion to Dismiss ("Motion") Plaintiff Bill G.

23   Destefani's ("Destefani" or "Plaintiff") Complaint.  Dkt. 20 ("Mot.").  Plaintiff

24   opposes the Motion.  Dkt. 30 ("Opp.").  On April 2, 2021, the court found this matter

25   appropriate for resolution without oral argument and vacated the hearing set for April

26   9, 2021.  Dkt. 33; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15.

27        For the reasons stated below, the court GRANTS in part and DENIES in part

28   Defendants' Motion.

                                         1

**BACKGROUND**[1]

Plaintiff Bill F. Destefani is an airplane racer.  Dkt. 1 ("Compl.") ¶ 13.  He owns the Strega airplane, which is a modified P-51 Mustang originally flown by the Royal Australian Air Force in 1945.  *Id.* ¶ 14.  Strega is known for certain identifying features, including its paint job, a stylized number "7" on its tail, the image of the Italian flag behind the cockpit, Destefani's name in script font underneath the cockpit, and the stylized word "Strega" on the front of the airplane near the nose.  *Id.* ¶ 15. Since he has won several high-profile airplane races flying Strega, Plaintiff contends he and Strega are famous in the aeronautics and airplane exhibition industries.  *Id.* ¶ 16.

Plaintiff is the owner of U.S. Trademark Registration Number 1,731,724 (the "'724 Registration") for the stylized word "Strega" (the "Strega Mark") in International Class 041 for "entertainment services in the nature of airplane racing." *Id.* ¶¶ 27-29.



The United States Patent and Trademark Office ("USPTO") published the '724 Registration on or around November 10, 1992, and it is live, enforceable, and incontestable under 15 U.S.C. § 1065.  *Id.* ¶¶ 29-32.  Plaintiff also claims common law trademark rights in the standard character mark STREGA, his own name "Bill Destefani," his nickname "Bill 'Tiger' Destefani" (collectively with the Strega Mark, the "Destefani Marks"), and the total image, design, and appearance of Strega (the "Strega Trade Dress").  *Id.* ¶¶ 34-35.

Defendants Ubisoft Entertainment, Ubisoft, Inc., and Ivory Tower are developers, producers, and distributors of video games.  *Id.* ¶ 43.  Defendants created

---

[1] The following background facts are alleged in Plaintiff's Complaint, and must be accepted as true for purposes of the subject Fed. R. Civ. P. 12(b)(6) motion to dismiss. *See, e.g., Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016).

1    and distributed a game entitled *The Crew 2*, which they describe as a game that allows

2    users to "[e]xperience the thrill of intense motorsports action in a car, truck,

3    motorcycle, boat, off-road buggy, or even a stunt plane!"  *Id.* ¶ 46.  Plaintiff contends

4    Defendants, without his authorization, included a virtually identical recreation of

5    Strega in *The Crew 2* flown by a pilot, as pictured below.  *Id.* ¶¶ 49-53; Fig. 3.



| Strega | Defendants' Strega |

13    Plaintiff also alleges Defendants use this virtually identical recreation of Strega

14    in their advertising and promotion of the video game, including on Ubisoft's website,

15    as shown below.  *Id.* ¶¶ 55-59; Fig. 4.



NORTH AMERICAN – P51 Mustang™ STREGA™ (1945)

Make the American sky your playground with this amazing version of the authentic P51 Mustang™. Completely redesigned for air races, this champion is the perfect partner for winning.

26    Plaintiff filed this action against Defendants on November 4, 2020, stating:

27    (1) three claims under the federal Lanham Act for false endorsement (15 U.S.C.

28    § 1125(a)), trademark infringement (15 U.S.C. § 1114), and unfair competition (15

1   U.S.C. §1125(a)) (collectively, the "Lanham Act claims"); and (2) violation of

2   California's common law right of publicity and statutory right of publicity (Cal. Civ.

3   Code § 3344 ("§ 3344")) (collectively, the "right of publicity claims").  *See generally*

4   Compl.

**DISCUSSION**[2]

6   **I.     Legal Standard**

7         Under Fed. R. Civ. P. 12(b)(6), a party may file a motion to dismiss a complaint

8   for "failure to state a claim upon which relief can be granted."  The purpose of Rule

9   12(b)(6) is to enable defendants to challenge the legal sufficiency of claims asserted

10  in a complaint.  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir.

11  1987).  A district court properly dismisses a claim under Rule 12(b)(6) if the

12  complaint fails to allege sufficient facts "to state a cognizable legal theory."  *Caltex*

13  *Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

14        "To survive a motion to dismiss, a complaint must contain sufficient factual

15  matter … to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

16  556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

17  (2007)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

18  need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of

19  his 'entitlement to relief' requires more than labels and conclusions, and a formulaic

20  recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555

21  (internal citations omitted).  "Factual allegations must be enough to raise a right to

22  relief above the speculative level."  *Id.* (internal citations omitted).  "Determining

23

24  [2] Defendants request the court take judicial notice of several images and items
    manually lodged with the court.  Dkt. 21.  The court GRANTS the request as to the
25  retail copy of Defendants' game *The Crew 2*, as made available for Microsoft's Xbox
    One platform.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir.
26  2018) (noting an item may be deemed incorporated by reference into the complaint if
    the plaintiff refers extensively to it or it forms the basis of the plaintiff's claim).
27  Defendants' additional requests for judicial notice are DENIED as moot as the court
28  did not rely on them to resolve the present Motion.

4

1  whether a complaint states a plausible claim for relief is 'a context-specific task that

2  requires the reviewing court to draw on its judicial experience and common

3  sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556

4  U.S. at 679).

5      When evaluating a complaint under Rule 12(b)(6), the court "must accept all

6  well-pleaded material facts as true and draw all reasonable inferences in favor of the

7  plaintiff." *Caltex*, 824 F.3d at 1159; *Manzarek v. St. Paul Fire & Marine Ins. Co.*,

8  519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint

9  as true and construe the pleadings in the light most favorable to the nonmoving

10  party."). Legal conclusions, however, "are not entitled to the assumption of

11  truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A court

12  must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary

13  judgment if it considers evidence outside the pleadings. *United States v. Ritchie*, 342

14  F.3d 903, 907-08 (9th Cir. 2003). "A court may, however, consider certain

15  materials—documents attached to the complaint, documents incorporated by reference

16  in the complaint, or matters of judicial notice—without converting the motion to

17  dismiss into a motion for summary judgment." *Id.*

18  **II.    Analysis**

19      Defendants argue Plaintiff's Complaint must be dismissed in its entirety

20  because (1) the Lanham Act claims are barred by the First Amendment, and

21  (2) Plaintiff's statutory and common law right of publicity claims both fail as a matter

22  of law and are barred by the First Amendment. Mot. 2. The court considers each

23  argument in turn.

24      **A.    Plaintiff's Lanham Act Claims**

25      Generally, courts within the Ninth Circuit apply an eight-factor "likelihood-of-

26  confusion test" to claims brought under the Lanham Act. *Twentieth Century Fox*

27  *Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017). But when a

28  trademark is included in an expressive work, the protections afforded under trademark

1   laws must also be balanced against broader First Amendment concerns.  *See Mattel,*

2   *Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (noting "when a

3   trademark owner asserts a right to control how we express ourselves … applying the

4   traditional [likelihood-of-confusion] test fails to account for the full weight of the

5   public's interest in free expression").  In circumstances involving an expressive work,

6   a plaintiff with Lanham Act claims must instead overcome the test articulated in

7   *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which was adopted by the Ninth

8   Circuit in *Mattel*, 296 F.3d at 902, and *E.S.S. Entertainment 2000, Inc. v. Rock Star*

9   *Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).[3]

10                  *1.      The Rogers Test*

11         "The *Rogers* test requires the defendant to make a threshold legal showing that

12   its allegedly infringing use is part of an expressive work."  *Gordon v. Drape*

13   *Creative, Inc.,* 909 F.3d 257, 264 (9th Cir. 2018).  If the defendant successfully makes

14   the threshold showing, the Lanham Act will not apply unless the plaintiff (1) satisfies

15   the likelihood-of-confusion test, and (2) can also show "[a] the [trademark use] has no

16   artistic relevance to the underlying work whatsoever, or, [b] if it has some artistic

17   relevance, [that the trademark use] explicitly misleads as to the source or the content

18   of the work."  *Id.* at 264-65; *see also Rogers*, 875 F.2d at 999 (noting that the Lanham

19   Act "should be construed to apply to artistic works only where the public interest in

20   avoiding consumer confusion outweighs the public interest in free expression")).

21         Here, Plaintiff does not contest that *The Crew 2* is an expressive work, thus

22   Defendant has met *Gordon*'s "threshold legal showing" for purposes of this Motion.

23   Opp. 7 n.1.  Further, Defendant does not argue Plaintiff fails to satisfy the likelihood-

24   of-confusion test, and Plaintiff does not contend Defendants' use of the Destefani

---

26   [3] Although *Mattel* adopted the *Rogers* test in the context of using a trademark in the
27   title of a work, *E.S.S.* clarified that the *Rogers* test also applies in cases where, as here,
     the trademark in question is used in the body of an expressive work.  *E.S.S.*, 547 F.3d
28   at 1099.

1 Marks and Strega Trade Dress have "no artistic relevance" to the video game.  *See*

2 *generally* Mot; Opp. 7 n.1.  Thus, the sole issue before the court turns on the second

3 prong of the *Rogers* test, i.e., whether Plaintiff has alleged sufficient facts that

4 Defendants' use of his alleged trademarks "explicitly misleads as to the source or the

5 content" of the video game.  *Rogers*, 875 F.2d at 999.

6                             2.        *"Explicitly Misleads" Prong*

7          To overcome the *Rogers* test, Plaintiff must show that use of the Destefani

8 Marks and Strega Trade Dress in Defendants' video game "explicitly misleads"

9 consumers to believe Plaintiff sponsored or is otherwise behind the video game.

10 *E.S.S.*, 547 F.3d at 1100; *see also Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th

11 Cir. 2013) ("It is key here that the creator must *explicitly* mislead consumers.") (italics

12 in original).  "[T]he slight risk that … use of a celebrity's name might *implicitly*

13 suggest endorsement or sponsorship to some people is outweighed by the danger of

14 restricting artistic expression, and [in cases where there is no explicit misleading], the

15 Lanham Act is not applicable."  *Brown*, 724 F.3d at 1245 (citing *Rogers*, 872 F.2d at

16 1000) (emphasis added).  Thus, the court must consider whether there was an "explicit

17 indication," "overt claim," or "explicit misstatement" that caused consumer confusion

18 regarding the source or content of *The Crew 2*.  *Id.*; *see also Twentieth Century Fox*,

19 875 F.3d at 1199 (finding Fox's *Empire* television show, which contained no overt

20 claims or explicit references to plaintiff Empire Distribution, not explicitly misleading

21 of plaintiff's "Empire" mark).

22          Defendants note several courts within the Ninth Circuit have applied *Rogers* to

23 dismiss trademark claims relating to video games, finding the trademark use was not

24 explicitly misleading as a matter of law.  Mot. 10 (citing, inter alia, *VIRAG, S.R.L. v.*

25 *Sony Comput. Ent. Am. LLC*, 2015 WL 5000102 (N.D. Cal. Aug. 21, 2015), *aff'd* 699

26 F. App'x 667 (9th Cir. 2017) (use of trademark as signage on a virtual race track);

27 *Brown*, 724 F.3d at 1248 (depiction of football player in *Madden NFL* video game);

28 *Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1140 (N.D.

1   Cal. 2014) (use of military patch in *Call of Duty: Ghosts* video game); *Novalogic, Inc.*

2   *v. Activision Blizzard*, 41 F. Supp. 3d 885, 904 (C.D. Cal. 2013) (use of "Delta Force"

3   name and logo in *Call of Duty—Modern Warfare 3* video game)).

4         Plaintiff responds that his claims are not governed by Defendants' cited cases,

5   but by the more recent *Gordon* case, where the Ninth Circuit held that "[i]n some

6   instances, the use of a mark alone may explicitly mislead consumers about a product's

7   source."  Opp. 9 (citing *Gordon*, 909 F.3d at 270); *see also id.* at 269 (noting the

8   defendant need not make an affirmative statement of plaintiff's sponsorship or

9   endorsement to be liable under the Lanham Act).

10         In *Gordon*, plaintiff Christopher Gordon had posted a video on YouTube

11   entitled *The Crazy Nastyass Honey Badger*.[4]  *Id.* at 261.  The video featured National

12   Geographic footage of a honey badger in the wild, overlaid with Gordon's narration.

13   *Id.*  As the honey badger places itself in various precarious situations to eat, for

14   example, cobras and bee larvae, Gordon humorously repeats the phrases "honey

15   badger don't care" and "honey badger don't give a s**t."  *Id.* at 261, 263 & n.3.  The

16   video went viral, and Gordon began selling goods with the phrases "honey badger

17   don't care" and "honey badger don't give a s**t," including books, calendars, t-shirts,

18   costumes, mouse pads, mugs, and decals.  *Id.* at 261.  The Patent and Trademark

19   Office registered the phrase "Honey Badger Don't Care" for, inter alia, International

20   Class 16 (greeting cards, etc.).  *Id.*  Gordon secured several licensing agreements for

21   various honey-badger themed products, including greeting cards.  *Id.* at 262.  At the

22   same time Gordon was negotiating the licensing agreements, the defendants began

23   developing their own line of unlicensed honey-badger greeting cards using the phrases

24   "honey badger don't care" and "honey badger don't give a s**t."  *Id.* at 262-63.

25

26

27

28   [4] Christopher Gordon, *The Crazy Nastyass Honey Badger*, YOUTUBE (Jan. 18, 2011), https://www.youtube.com/watch?v=4r7wHMg5Yjg.

1      The Ninth Circuit in *Gordon* ultimately reversed the district court's grant of

2   summary judgment for defendants, holding there was a triable issue of fact whether

3   the defendants' use of the honey badger phrases in greeting cards explicitly misled

4   consumers to believe Gordon was affiliated with them. *Id.* at 271.  It reviewed several

5   prior Ninth Circuit opinions interpreting *Rogers* and acknowledged that it had

6   "repeatedly observed that 'the mere use of a trademark alone cannot suffice to make

7   such use explicitly misleading.'" *Id.* at 270 (quoting *E.S.S.*, 547 F.3d at 1100-01).

8      In departing from the prior cases, the panel identified two additional

9   considerations relevant to the "explicitly misleading" inquiry: (1) "the degree to which

10  the junior user uses the mark in the same way as the senior user"; and (2) "the extent

11  to which the junior user has added his or her own expressive content to the work

12  beyond the mark itself"—i.e., whether the mark was a "centerpiece" of the expressive

13  work itself, unadorned with any artistic contribution by the junior user. *Id.* at 270-71.

14  The court noted that each time it had held that mere use of a trademark alone did not

15  explicitly mislead consumers as to the source of the artistic work, (1) the junior user

16  employed the mark in a different context—often in an entirely different market—than

17  the senior user, and/or (2) the use of the trademark was not the centerpiece of the

18  expressive work. *Id.*

19     Here, applying *Gordon*, the court finds Plaintiff has not sufficiently alleged

20  Defendants' use of the Destefani Marks and Strega Trade Dress in *The Crew 2* video

21  game explicitly misleads consumers as to the video game's source or content.  Based

22  on the facts alleged in the Complaint, the court finds as a matter of law that a

23  consumer would not reasonably believe Plaintiff to be affiliated with the video game.

24  First, unlike in *Gordon* where both parties made greeting cards, Plaintiff and

25  Defendants use the trademarks in different markets.  While Defendants allegedly use

26  the trademarks in their video game, Plaintiff's mark is registered for "entertainment

27  services in the nature of airplane racing."  Compl. ¶¶ 29, 44.  As Plaintiff's trademarks

28  are used in different contexts and markets, Defendants' use of Plaintiff's trademark

1   does not reflect the type of "explicitly misleading description" of source that *Gordon*

2   and *Rogers* condemn.  *See Gordon*, 909 F.3d at 270 (discussing *E.S.S.*, 547 F.3d at

3   1100-01, and noting the use of a strip club's trademark in the video game *Grand Theft*

4   *Auto* did not explicitly mislead consumers under *Rogers* because the trademark was

5   used in different markets); *see also AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.

6   Supp. 3d 467, 481 (S.D.N.Y. 2020) ("Put simply, Plaintiff's purpose in using its mark

7   is to sell vehicles to militaries, while Defendants' purpose is to create realistically

8   simulating modern warfare video games for purchase by consumers.").

9          Nor does Plaintiff plausibly allege Defendants' video game does not add

10   considerable expressive content beyond Plaintiff's mark themselves.  While Plaintiff

11   alleges in a conclusory fashion that Defendants "have used the video game replica of

12   Strega as a centerpiece of *The Crew 2*," Compl. ¶ 80, "a plaintiff's obligation to

13   provide the 'grounds' of his 'entitlement to relief' requires more than labels and

14   conclusions, and a formulaic recitation of the elements of a cause of action will not

15   do." *Twombly*, 550 U.S. at 555 (internal citations and brackets omitted).  From the

16   court's review of the game, players may choose from dozens—if not hundreds—of

17   vehicles, which are not limited to airplanes.  Indeed, Plaintiff's Complaint

18   acknowledges Defendants describe *The Crew 2* as permitting players to choose

19   amongst several "iconic vehicles" to experience the game's virtual reality, including

20   cars, trucks, motorcycles, boats, and off-road buggies.  Compl. ¶ 46.   Plaintiff does

21   not, for example, allege the video game is named *Strega*, or that the Strega airplane is

22   the only "iconic vehicle" for players to fly.  Thus, the alleged use of the Destefani

23   Marks and Strega Trade Dress does not form the "centerpiece" of Defendants'

24   expressive work.  *See Gordon*, 909 F.3d at 271 (noting that "[i]n *E.S.S.*, the use of the

25   Pig Pen strip club was quite incidental to the overall story of the video game, such that

26   it was not the game's main selling point" and that "in *Brown*, Jim Brown was one of

27   thousands of current and former NFL players appearing in the game") (internal

28   quotations and citations omitted).

1    In sum, the court concludes that, under the *Rogers* test and in light of the

2  additional considerations of *Gordon*, the Lanham Act does not apply to Defendants'

3  use of Plaintiff's trademarks in their expressive work.  At most, Plaintiff's allegations

4  show Defendants' use of Plaintiff's trademarks merely implicitly suggest he endorsed

5  or sponsored *The Crew 2*, which is not sufficient to stifle Defendants' First

6  Amendment rights.  *See Rogers*, 872 F.2d at 999; *Gordon*, 909 F.3d at 270-71.

7    Finally, aside from the alleged use of Plaintiff's trademarks within Defendants'

8  video game itself, Plaintiff also argues Defendants' use of "STREGA™" on their

9  website advertising *The Crew 2* explicitly misleads consumers into thinking Ubisoft

10  owns the STREGA trademark.  Opp. 8-9.  Confusion regarding ownership of a

11  trademark, however, is not the relevant test under *Rogers*; the proper inquiry is

12  whether the advertising would cause consumers to believe Plaintiff <u>endorsed</u>

13  Defendants' video game.  *See Brown*, 723 F.3d at 1245-46.  Here, as in *Brown*, none

14  of the advertising materials cited in the Complaint explicitly misleads consumers

15  about Plaintiff's endorsement of the game.  *See* Compl. ¶¶ 56-60 (stating Defendants

16  used the airplane's likeness and trademark in advertisements and cover art, but not

17  identifying any explicit statement of endorsement).  Thus, Defendants' use of

18  Plaintiff's trademark, by itself, is insufficient to constitute an explicitly misleading

19  statement of endorsement.  *See Brown*, 723 F.3d at 1246 (holding defendant's use of

20  plaintiff's likeness and promotion materials were insufficient to show any attempt to

21  mislead consumers).

22    Accordingly, the court GRANTS Defendants' Motion and DISMISSES the

23  Lanham Act claims (Plaintiff's third, fourth, and fifth causes of action) WITH

24  PREJUDICE.

25    **B.    Plaintiff's Right of Publicity Claims**

26    Defendants also argue Plaintiff fails to state a claim for his two right of

27  publicity claims under Cal. Civ. Code § 3344 and California's common law.  Mot. 16-

28

11

1    19.  Further, Defendants contend that even if Plaintiff can adequately allege right of

2    publicity claims, they are barred by the First Amendment.   Mot. 19-23.

3                      *1.      Sufficiency of Right of Publicity Claims*

4         "The right of publicity protects an individual's right to profit from the

5    commercial value of his or her identity."  *Ross v. Roberts*, 222 Cal. App. 4th 677, 684

6    (2013).  California recognizes both a common law and statutory right of publicity.  *Id.*

7    To state a common law cause of action, a plaintiff must plead: "(1) the defendant's use

8    of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to

9    defendant's advantage, commercially or otherwise; (3) lack of consent; and

10   (4) resulting injury."  *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th

11   Cir. 2001).  Similarly, the statutory right to publicity under § 3344(a) makes it illegal

12   for any person to "knowingly use[] another's name, voice, signature, photograph, or

13   likeness, in any manner, on or in products, merchandise, or goods, or for purposes of

14   advertising or selling, or soliciting purchases of, products merchandise, goods or

15   services, without such person's prior consent … ."  Under § 3344, a plaintiff must

16   prove all the elements of the common law cause of action, and must also "allege a

17   knowing use by the defendant as well as a direct connection between the alleged use

18   and the commercial purpose."  *Downing*, 265 F.3d at 1001; *Abdul-Jabbar v. Gen.*

19   *Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996) ("We have construed [§ 3344's]

20   protection of 'name, voice, signature, photograph, or likeness' more narrowly than the

21   common law's protection of 'identity.'").

22        Defendants contend the first and second causes of action fail because Plaintiff

23   does not allege his actual appearance or "likeness"—i.e., any visual depiction of

24   him—occurs in *The Crew 2*.  Mot. 17, 19, 23-25.  Defendants cite *Newcombe v. Adolf*

25   *Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998) to argue "'likeness' refers to a 'visual

26   image of a person' that is akin to a photograph, and must be 'readily identifiable.'"

27   *Id.* at 17.

28

California law, however, protects not only use of a plaintiff's "likeness," but also use of his name or signature. *Downing*, 265 F.3d at 1001 (reversing district court's grant of summary judgment in favor of defendants on plaintiff's statutory and common law right of publicity claims, recognizing California law protects a person's "name and likeness"); Cal. Civ. Code § 3344(a) (protecting a person's name, voice, signature, photograph, or likeness). Here, Plaintiff alleges his name legibly appears in script font on the Strega airplane depicted in Defendants' video game. Compl. ¶¶ 49, 69. This allegation is sufficient for Plaintiff to plead Defendants appropriated his name and signature to their advantage. *See Downing*, 265 F.3d at 1001.

Defendants argue that review of the video game "under normal playing conditions reflects that Plaintiff's name [on the virtual Strega airplane] is very difficult to discern." Mot. 17. To be sure, courts have recognized that "incidental use" is a defense for right of publicity and commercial misappropriation claims. *Schroeder v. Volvo Grp. N. Am., LLC*, No. 2:20-cv-05127-VAP (PVCx), 2020 WL 6562242, at *12 (C.D. Cal. Sept. 3, 2020) (citing *Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1180 n.5 (9th Cir. 2015)). But whether Defendants' use of Plaintiff's name on the Strega airplane in Defendants' video game is merely "incidental" and, thus, not actionable, raises factual issues not appropriate for resolution on the present Motion to Dismiss. *See, e.g.*, *Schroeder*, 2020 WL 6562242, at *12 (declining to decide incidental use defense as a matter of law). The court, therefore, will not dismiss the first and second causes of action on this basis.

Lastly, Defendants argue the first cause of action under § 3344 fails because Plaintiff does not allege a "direct connection" between the alleged use of Plaintiff's name appearing on the virtual Strega airplane and the commercial purpose. Mot. 18. To the contrary, Plaintiff alleges "Defendants have willfully and without authorization used Destefani's identity, persona, name, and likeness for commercial purposes, to advertise *The Crew 2*, to promote sales of *The Crew 2*, and within *The Crew 2* video game itself, and have continuously republished *The Crew 2* since its release,"

1    including by featuring the image of the Strega airplane in advertisements, promotions,

2    and cover art for *The Crew 2*. Compl. ¶¶ 59, 69, 91. Further, "it shall be a question of

3    fact whether or not the use of the person's name, voice, signature, photograph, or

4    likeness was so directly connected with the commercial sponsorship or with the paid

5    advertising as to constitute a use for which consent is required." Cal. Civ. Code

6    § 3344(e).

7            Accordingly, the court finds Plaintiff has adequately alleged the first cause of

8    action for violation of Cal. Civ. Code § 3344 and the second cause of action for

9    violation of the California common law right of publicity and DENIES Defendants'

10   Motion as to these claims.

                        *2.        First Amendment Affirmative Defense*

12           Lastly, Defendants argue that, like Lanham Act claims, right of publicity claims

13   involving expressive works are subject to heightened scrutiny under the First

14   Amendment. Mot. 19.

15           As the California Supreme Court explained in *Comedy III Productions, Inc. v.*

16   *Gary Saderup, Inc.*, 25 Cal. 4th 387, 396-97 (2001), tension exists between First

17   Amendment rights and the right of publicity. The purposes of the First Amendment

18   include "preserv[ing] an uninhibited marketplace of ideas" and "foster[ing] a

19   fundamental respect for individual development and self-realization." *Id.* (quotations

20   omitted). The right of publicity has the potential to frustrate these purposes, as

21   celebrities take on public meaning, and the appropriation of their likeness may have

22   important uses in uninhibited debate on public issues. *Id.* at 397; *see also Ross*, 222

23   Cal. App. 4th at 685 ("A right of publicity has the potential to frustrate [First

24   Amendment values], as it can lead to suppression of individual expression and

25   censorship of the public display of ideas.") (citing *Comedy III*, 25 Cal. 4th at 397).

26           In light of this tension, the California Supreme Court developed a test to

27   balance First Amendment concerns with the right of a person to control the

28   commercial exploitation of her name, likeness, and identity. The central inquiry is

                                          14

1   whether and to what extent a work is "transformative."[5]  *Comedy III*, 25 Cal. 4th at

2   404.  A court assesses whether a work is "transformative" by considering:

3   
4   
5   
6   
7

> whether the celebrity likeness is one of the "raw materials" from
> which an original work is synthesized, or whether the depiction or
> imitation of the celebrity is the very sum and substance of the work in
> question.  We ask, in other words, whether a product containing a
> celebrity's likeness is so transformed that it has become primarily the
> defendant's own expression rather than the celebrity's likeness.

8   *Id.* at 405.  This is because "[w]hen artistic expression takes the form of a literal

9   depiction or imitation of a celebrity for commercial gain, directly trespassing on the

10  right of publicity without adding significant expression beyond that trespass, the state

11  law interest in protecting the fruits of artistic labor [and the right of publicity]

12  outweighs the expressive interests of the imitative artist."  *Id.* at 405.  On the other

13  hand, "when a work contains significant transformative elements, it is not only

14  especially worthy of First Amendment protection, but it is also less likely to interfere

15  with the economic interest protected by the right of publicity.  …  Accordingly, First

16  Amendment protection of such works outweighs whatever interest the state may have

17  in enforcing the right of publicity."  *Id.*

18          Defendants contend their use of the Strega airplane is transformative because

19  *The Crew 2* is primarily Defendants' own expression, and the Strega airplane's

20  contribution to the video game is negligible.  Mot. 21-22.  The mere use of Destefani's

21  name and the Strega airplane within a new medium, such as a video game, however, is

22  not sufficiently transformative—the court instead must assess whether Plaintiff's

23  name and/or likeness were themselves transformed as depicted in the video game.  *See*

24  _____

25  [5] Defendants briefly argue that because *The Crew 2* is an expressive work, the court
    need not reach the question of whether the transformative use defense applies.  Mot.
26  20.  The court disagrees.  *See, e.g., No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App.
    4th 1018, 1029 (2011) (recognizing video games are expressive works and applying
27  transformative use test to character depicted in the game); *Kirby v. Sega of Am., Inc.*,
28  144 Cal. App. 4th 47, 58 (2006) (same).

1   *No Doubt*, 192 Cal. App. 4th 1018, 1034 (2011) ("[T]hat the avatars appear in the

2   context of a video game that contains many other creative elements[ ] does not

3   transform the avatars into anything other than exact depictions of No Doubt's band

4   members doing exactly what they do as celebrities."); *see also In re NCAA Student-*

5   *Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1276, 1278-79 (9th Cir.

6   2013) (finding no error where the district court focused primarily on plaintiff's

7   likeness rather than the transformative elements of the game as a whole).

8          Furthermore, the California Supreme Court has "envisioned the application of

9   the [transformative use] defense as a question of fact." *Hilton v. Hallmark Cards*, 599

10   F.3d 894, 910 (9th Cir. 2010) (citing *Comedy III*, 25 Cal. 4th at 409).  Thus, a

11   defendant is entitled to the defense as a matter of law only if no trier of fact could

12   reasonably conclude that the use was not transformative.  *Id.*

13          At this stage of the action, the court cannot conclude that Defendants' use of

14   Plaintiff's name or signature contains significant "transformative elements" such that

15   Defendants are entitled to the defense as a matter of law.  *See Hilton*, 599 F.3d at 911

16   (finding enough doubt regarding the transformative elements related to plaintiff's

17   alleged portrayal in a greeting card to preclude dismissal based on the transformative

18   use defense); *see also In re NCAA*, 724 F.3d at 1279 ("Given that [the video game]

19   realistically portrays college football players in the context of college football games,

20   the district court was correct in concluding that [the defendant] cannot prevail as a

21   matter of law based on the transformative use defense …."); *but see Ross*, 222 Cal.

22   App. 4th at 689 (finding defendant rapper's use of plaintiff's name and identity

23   transformative as a matter of law because he "created music by adding significant

24   transformative elements to the base components of [the] plaintiff's name and

25   identity," and thus his music and persona were "much more than literal depictions" of

26   the plaintiff).

27          The court, therefore, DENIES Defendants' Motion as to Plaintiff's right of

28   publicity claims.

**III.    Order to Show Cause**

As the court has dismissed with prejudice Plaintiff's Lanham Act claims, the court may decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  28 U.S.C. § 1367(c)(3); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (noting that when "federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice").  Accordingly, the court ORDERS the parties to Show Cause ("OSC") in writing why the court should exercise its supplemental jurisdiction over the state law claims.  The parties shall meet and confer regarding this issue and file either one joint brief or simultaneous briefs not to exceed ten (10) pages by January 28, 2022.  There will be no oppositions or replies.

**<u>CONCLUSION</u>**

For the reasons stated above, the court GRANTS in part and DENIES in part Defendants' Motion to Dismiss.  Defendants shall file an answer within fourteen (14) days of this order.  Fed. R. Civ. P. 12(a)(4)(A).  The parties are further ORDERED to respond to the OSC by January 28, 2022.

IT IS SO ORDERED.


Dated: January 10, 2022

                                   FERNANDO L. AENLLE-ROCHA
                                   United States District Judge